THE JOHN A. BROWN.

THE GULFCOAST.

Nos. A–17380, 17606.

District Court, E. D. New York.

Feb. 18, 1948.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Oriental Trade & Transport Co., Limited.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for Gulf Oil Corporation.

936

BYERS, District Judge.

These causes were tried together since they involve but two versions of one collision between two vessels in a 12-column convoy, the Motor Vessel John A. Brown and the Steam Tanker Gulfcoast, on August 25, 1943, at 10:23 P.M. (convoy time) in about latitude 54° 33′ N, and longitude about 18° 37′ West, in the North Atlantic during the last quarter of a voyage that began in New York on August 14, and ended in the Clyde on August 28, 1943.

The Brown is 508 feet by 70 feet, of 10,455 gross and 6,059 net tonnage. She is a single screw, operated by Fiat engines, and was fully laden with war materiel.

The Gulfcoast is 426.4 feet by 64.2 feet, also a single screw, having steam engines; she has a gross tonnage of 7,140 and net 4,373. She was carrying oil to the capacity of her tanks.

These vessels were both in column 7, counting from the left. The commodore ship was number 71, the leader of this column; the Gulfcoast was number 72; the Socony Vacuum was number 73, and the Brown was number 74. In the evening or afternoon of August 25th, the Socony Vacuum left the convoy, thus vacating her station, and the Brown moved up to take her place. Apparently that change was accomplished without incident, for these two vessels seem to have been fairly established in stations 72 and 73, respectively, at 9:00 P. M. according to the testimony of their respective witnesses. At about that hour drizzling rain set in, which reduced visibility to about a quarter of a mile, and the Brown seems to have lost sight of the Gulfcoast thereafter. The collision seems to have been in the making from about 10:00 P. M. until it occurred about twenty minutes later.

The conflicting versions are:

For the Brown, that the Gulfcoast being to port and ahead, namely between the sixth and seventh columns, headed toward the latter, and having first dropped back to port of the Brown, angled sharply to her own starboard, and tried to cross ahead of the Brown; and failing that, struck the latter on her port side well forward, and was then caused to strike again from a position alongside, on the Brown's port quarter.

For the Gulfcoast, it is asserted that the Brown came up from astern, on the starboard side, and when she had progressed so that she was about 4 points on the starboard bow of the Gulfcoast, she made an abrupt change of course to her own port, in an apparent effort to cross ahead, and so brought herself athwart the bow of the Gulfcoast, which caused the collision; then under a rapid starboard turn, brought her port quarter into collision with the Gulfcoast, well aft on the starboard side.

There is no assistance to be derived from a showing of the nature of the damage suffered by either craft, which might indicate which vessel struck the harder blow; nor has the direction in which plates or other objects were bent or broken been brought to light.

Since all the testimony is by deposition, save that concerning the reading of the record of the course recorder of the Brown, decision will turn upon the margin of persuasion emerging from the narratives so embodied.

It is common ground that a moderate sea prevailed, which caused spray to fly, and that from about 9:00 o'clock on it was raining to such an extent that both masters believed that better lookout could be maintained in the shelter of the bridge than on the forecastle head, since the vision of men so stationed would not be obscured by rain being driven into their faces.

Also that the wind was out of the northwest of a force of about 3, and that there was no fog. That all of the ships in the convoy were blacked out, and carried no lights except stern lights which showed blue and were angled down to the surface of the sea. It is not meant that all vessels displayed such lights at all times, if the testimony is understood; but they were switched on as the occasion might seem to require.

It is particularly difficult to say whether the stern light from the commodore's ship, number 71, was burning at all times important to this case, since no one from her was called.

It is not disputed that the course of the convoy was 82 true (between east and east by north) and both these ships assert that they adhered thereto. The Gulfcoast in order to make 82 good had to follow a course of 84 to compensate a 2° westerly compass error.

The spacing between columns was not less than 2,100 feet (four ship's lengths of the Brown), and between stations fore and aft, not less than 1,500 feet (three ship's lengths of the Brown).

The Brown makes these distances somewhat greater, but the difference can hardly influence the choice which must be made between the two stories.

Obviously station keeping in convoy cannot be mathematically exact even in daylight, and during the night when each ship is supposed to follow its leader, the difficulties of the task are enhanced by all prevailing physical conditions, plus the inability at times to make out the stern light just ahead of a given vessel, even if it is constantly displayed. When that light is not always showing, which this testimony seems to indicate, it is no cause for wonder that alignment and spacing are something less than precise.

As the result of study of the depositions and exhibits, and reflection upon the arguments of counsel, I am of the opinion that what probably occurred was that the Brown, having lost sight of the Gulfcoast and believing that she could see and follow the commodore ship in station 71, proceeded under automatic steering at the convoy speed of 9½ knots, as nearly in line as could be expected under the conditions which have been explained; sometime after 9:00 o'clock a ship was observed by the third officer who was in charge on the 8:00 to 12:00 P.M. watch, which bore about 2 to 2½ points on his port bow. It was in fact the Gulfcoast but he didn't realize that. She appeared to be in about station 62 (second in sixth column), but that was in itself a surprise, since there was only the leading ship (61) in that column. At that time the distance separating these vessels appeared to be around 2,000 feet.

The deck officer (Downer) flashed a signal with his torch in Morse Code "What no?" (meaning convoy number). He received no answer, but a long flash. Thus he did not acquire the desired information. This incident, it should be said, is uncontradicted, and the time was about 10:00 to 10:05 according to both versions.

The Brown at this time apparently was about in her station, i. e., she was abreast of her beam ship in column 8.

The Gulfcoast (as it turned out to be) was seen to be dropping back, and then converging toward the Brown's course, and the latter reduced her own revolutions from 80 to 70 in two steps; the Gulfcoast continued to angle to her starboard, and the Brown, sensing danger, turned on her navigation lights; her gyro pilot was put into hand position, and her rudder put hard right, and Downer called the master to the bridge.

When the latter arrived from the chart room, which is immediately behind the wheel-house, in about 2 minutes, the ship's maneuvers and revolutions were explained, and her show of lights, he ordered a one-whistle blast to indicate the starboard turn, and this was at once blown, but the Gulfcoast continued in her course, blew no whistle, showed no lights, and made no effective change of helm until just before the striking when a port helm is said to have put her over from 82 to about 50. Then she struck the Brown well forward near the port bow. The helm was then ordered to starboard to swing her stern away, but to no avail so far as averting a second impact was concerned, for that took place after an interval of some 30 seconds or less, so that both vessels again collided at about their respective quarters.

Fortunately there was no major casualty or loss of life, and both vessels eventually resumed their stations, suffering only undisclosed structural damage.

If the Gulfcoast did anything to avert the first collision by whistle signal, show of lights, or timely change of helm, I have been unable to discover it. She relies entirely upon the assertion that the Brown executed an unannounced and precipitate turn to her own port at a time and under

conditions which allowed of no remedial measures or navigation on her own part, and she argues that the Brown must be held either entirely or partly at fault.

In order to demonstrate that the foregoing summary of what the depositions reveal is not without support in the testimony, the following subjects will bear comment:

(a) *That the Brown was under automatic steering* until the rudder was put hard starboard as above stated, is deposed by both Downer, the third officer, and Ashington, an A. B., who was on the starboard wing of the bridge as an extra lookout. He was a wheelman, but did not serve in that capacity from 10:00 to 12:00 as he would have, except that the ship was under automatic steering.

This point is argued to the contrary by the proctors for the Gulfcoast, but without substantiation in the record.

(b) *As to whether the Brown maintained alignment in column 7* after she moved up to station 73 which had been vacated prior to 8:00 P. M. and probably much earlier, by the Socony Vacuum:

The Gulfcoast, by inference at least, charges that the Brown was out of column 7 in that she came up from astern to a position on the former's starboard hand, and moved far enough ahead to show her blue stern light. Eliasson, the Gulfcoast's master, who was on the bridge from 10:00 o'clock on, says the Brown was about a ship's length, 400–450 feet, distant, and she was edging away, i.e., to her own starboard, about this time. Watler, also third officer, is to the same effect, i.e., the Brown was out of station, coming up on the starboard quarter just "beaft" (sic) the bridge.

To accept the foregoing requires that the position of the Gulfcoast herself between 9:00 and 10:00 P. M. be deemed to have been established; this, however, presents great difficulty, for it depends upon her being in fact about astern of 71, the commodore ship. But these witnesses agree that the blue stern light of 71 was not shown until about 10:00 P. M., and so the assertion that the Gulfcoast was fairly lined up astern of a blacked out ship at least 1,000 feet ahead during a drizzling rain, is less than convincing in face of the testimony of Downer, that during the 9:00 to 10:00 P. M. period he was tailing behind the blue stern light of the commodore ship, and thus could not account for the whereabouts of the Gulfcoast.

If testimony from the commodore ship on this subject could be consulted, it would be helpful, but there is none.

It seems undisputed that, as to the Gulfcoast herself, no stern light was showing until about 10:00 o'clock, for so her witnesses say, as does Downer. Why this should have been true is difficult to understand, considering the weather conditions and the difficulty of maintaining station without some guide to a following ship. The subject is further illuminated by Graves (he was of the Armed Guard of the Gulfcoast with a rating as signalman third class, and so functioned, literally), who states that he was called to the starboard wing of the bridge at about 10:00 or 10:05 P. M., and read a blinker signal from the commodore: "Please show blue stern light". Since Watler says he turned on the blue stern light at about this time, it must be deemed established that until then the Gulfcoast was not showing such a light, which corroborates Downer of the Brown, on that subject. If he is right as to that, he may perhaps be relied upon when he asserts that he followed the commodore's stern light during the interval between 9:00 and 10:00 P. M.

This means that no wide departure from column 7 on the part of the Brown is deemed to have been shown. As to the Gulfcoast, since she says the commodore did not show a stern light, I think her witnesses are mistaken on that subject, and that they simply were unable to see that light for much of the time between 9:00 and 10:00, either because of the rainfall or such rolling as a moderate sea would cause; this resulted in her straying into the waters between the seventh and sixth columns between 9:00 and 10:00 P. M.

(c) *As to a change in speed of the Gulfcoast:*

No reason is seen to doubt that this indeed took place. Her third officer says that between 9:30 and 10:00 o'clock the convoy speed was reduced from 9½ knots

to about 7½ knots by action of the commodore ship (71) but without signal. The revolutions were cut down in two steps from 61 to 47 or 46, the latter about 10:00 o'clock. Presumably it is meant that observation of slower speed by the commodore ship alone accomplished this result. I do not stop to inquire as to the plausibility of this suggestion, but accept it as to the fact of slowing down.

That change of the Gulfcoast was observed from the Brown as has been stated, but what brought it about is not so clear. If it were necessary to decision, which it is not, I should incline to the view that between 9:00 and 10:00 o'clock the Gulfcoast found herself overtaking ship 71, and dropped back discreetly, and then headed toward the seventh column and preferred not to answer the flash light inquiry by the Brown during the course of that maneuver; that she relied upon her ability to resume her station ahead of the Brown and astern of the commodore ship, without inviting attention to herself, and failed to accomplish the purpose because she chose to ignore first the Brown's inquiry, and later her showing of lights and her whistle signal.

(d) *Was the Brown's turn just prior to the collision to port or starboard?*

Common sense teaches that it must have been to starboard since the presence of the then unidentified Gulfcoast, coming dangerously closer to port, was known to both MacCallum, the master, when he came to the bridge, and to Downer who had observed that ship for at least 20 minutes prior to the striking. Everything that the Brown did was consistent with a hard right turn, rather than the contrary.

It would have been starkly reckless to turn the Brown across the apparent heading of the Gulfcoast, and could not have been excused save to avoid a greater catastrophe, if one were threatened to starboard, than to execute the maneuver which in fact she did. Perhaps there is a hint of peril on her starboard hand, which I shall refer to presently.

Eliasson, the master of the Gulfcoast, would be a more convincing witness if he were less exuberant in seeking to give the Brown a bad name as a poor station keeper. His one reliance proved to be frail to the point of attenuation, as is shown by the deposition of Lirkin of the Socony Vacuum (73) in this convoy. He even went so far, without discoverable reason, as to put the Brown through the eighth column and into the ninth after the collision. He didn't believe in doing things by halves in his capacity as a witness.

Again, he says that he observed, during the moments just prior to the first collision, that the Brown was coming across his bow carrying a "bone in her teeth * * * she was still going at the full speed", yet she forced his bow over only 5° from 55 to 50.

Since the Brown is 82 feet the longer, and of about 1,750 tons greater displacement, the blow that she could inflict at full speed against the then helm movement of the Gulfcoast would of course have deflected the latter by more than 5°. In other words, Eliasson was more intent upon traducing the navigation of the other ship, than in vindicating his own, which seems to have been a more congenial task and simpler.

The course recorder of the Brown bears out the abrupt turn to starboard, according to the interpretation placed upon it by the only expert called to testify on the subject. Reading it is complicated by the absence from the recorder of the pen which would ordinarily have functioned to indicate the quadrant in which a helm movement beyond 90° would be shown. This omission was conventional during the war, and no reason is found to discredit the reading stated by Mr. Whitaker, the marine salesmanager of the Sperry Gyroscope Company, who assisted Mr. Sperry in designing the recorder. The sole value of this exhibit is that it tends to corroborate the testimony for the Brown that a turn to starboard was underway when she was struck by the Gulfcoast. Both Eliasson and Graves of the latter so describe the collision, although Watler says the Brown did the striking.

The one short blast of the Brown's whistle was consistent with that starboard turn, and Graves (Gulfcoast) heard it

940

just before the collision, though Eliasson and Watler say they did not. It was the signal prescribed by Rule 28 of International Rules, 33 U.S.C.A. § 113, and I have no misgiving in stating that it was sounded.

Finally, as to the necessity on the Brown's part, of avoiding one or more vessels in the eighth column, of which both Eckman for the Gulfcoast, and Ashington for the Brown, speak:

The starboard turn, which took the Brown through the S. E. quadrant and as far into the S. W. probably as the course recorder indicates, was a wide arc, which brought her in the vicinity of the eighth column which was about three lengths away, and the return to course 82 caused a swing to 89 before it was arrested; then she had further to continue back to about 76 as shown, probably to avoid one of the vessels in column 8. Ashington saw this, and told of two or three of those ships passing from starboard to port, ahead of the Brown. This movement, I conclude, is what Eckman referred to, only he placed it immediately prior to the collision. In this he must be in error, for the obvious reason that, if MacCallum had been required to turn to port instead of starboard at the time of the whistle signal, he would have blown 2 instead of 1, according to the Rule above cited. Moreover, he would have urged the proximity of what Eckman calls the "limey freighter" as an excuse for a port turn instead of the starboard one which was actually made.

Since a choice has to be made between the two narratives concerning the crucial issue of which turn was made by the Brown, it is clear to me that the evidence requires that it be in favor of her having turned to starboard, and by such a substantial margin as to admit of no doubt upon the subject.

■ With this understanding, it now is required to consider the arguments addressed to the faults attributed to the Brown:

I. Not having a lookout stationed on the bow.

Passing the temerity in arguing this at length on the part of a ship which followed the same practice and for the identical reason (that rain in the face of a lookout naturally impairs his vision) and which moreover did nothing to avoid the collision, the contention will be seen to require but brief consideration.

Each vessel was aware of the presence and apparent heading of the other, for a full 15 minutes before the collision. A lookout on the bow of the Brown could not have told the third officer on the bridge anything that the latter did not know and act upon. It is to be remembered that the Gulfcoast did not turn on her running lights at any time, so that to a man at the Brown's bow she would have appeared to be nothing more than a blacked out ship, to port, perhaps heading in the same general direction as his own ship, but due to the absence of running lights, he could not have been truly warned as to that.

So much Downer knew from his own observation, and from the reports of a lookout in the monkey-island atop the bridge. The contrast between the movements and positions of these ships, and those involved in The Corozal, D.C., 62 F.Supp. 123, ought to be obvious.

Those vessels were in collision as the result of moving in opposite directions, the one easterly and the other westerly, and neither apparently in a convoy. Perhaps a lookout on the bow of either could have been expected to function, even under blackout conditions; it does not appear that the Pierce had any lookout on duty, nor does the evidence point to any such continued mutual awareness on the part of each ship concerning the apparent movement of the other, as is shown by this record.

Upon the facts in this case, it is my opinion that, within the reasoning of Lind et al. v. United States, 2 Cir., 156 F.2d 231, the Brown has demonstrated beyond a reasonable doubt that her failure to post her lookout on the forecastle head was not a contributing cause of this collision. Nor do I see how courts can be dogmatic concerning the best posts of observation for lookouts during conditions of falling and blowing rain, in face of the judgment of experienced mariners holding certificates of the highest rating.

■ II. The Brown failed to switch on her lights at once when she began to maneuver.

The argument is addressed to the reduction in revolutions—engine speed—which is said to have been in effect for more than 5 minutes. (Reference to the starboard turn seems to have been carefully omitted.)

The cases cited to sustain the contention involve something other than a mere change of speed. They have been examined and will be found to treat of the necessity for a display of lights when two blacked out vessels are approaching, or are on crossing courses, so that a change in helm movement is required to avert disaster. Such indeed is a maneuver, and in order that it may be executed with the greatest possibility of safety, the display of lights is requisite; a failure or delay in that respect has been held to be a fault under the circumstances disclosed in a given cause.

■ I should suppose that a reduction in speed could be classed as a maneuver only in so far as a vessel following astern in convoy formation might be concerned; if the Gulfcoast had occupied a station astern of the Brown, and the latter had reduced her speed without warning of any kind, she could have been condemned if her conduct were shown to have been the cause of an overtaking collision. That, however, is not this case, and I find no authority for holding that the reduction in revolutions from 80 to 70 of itself required that she should at once show her lights.

It is to be remembered that the Gulfcoast failed to reveal her identity in response to the flash-light inquiry to which reference has been made.

Whether or not the excuse given by Graves for neither answering the inquiry, nor repeating it to the bridge, is deemed to be convincing, the fact is that the Brown was not informed that the vessel which was dropping back on her port hand was in fact the Gulfcoast. Had she been apprized of the latter's identity, her duties toward her would have been substantially greater than to an anonymous craft (Ashington, p. 12) whose probable navigation was a mere matter of conjec-

ture. She would have owed to the Gulfcoast the duty of cooperating with her to the fullest extent, to enable her to resume station 72.

There is of course room for difference of opinion on the subject, but I have been unable to discover in the testimony any basis for asserting that the navigation of the Gulfcoast was affected or influenced by the delay in showing running lights on the Brown. For instance, Eliasson says (p. 25) he came to the bridge at about 10:00 o'clock, which was 20 minutes before the collision, and *at that time* the Brown was showing "Yes—masthead light and the red side light", and that she was then about 200 feet off to the starboard quarter, "Pulling out from under our stern, proceeding slightly to the right of our course—pulling away", and again, that from 10:00 to 10:15 "She was coming up and passing us and getting farther away all the time—*getting farther over all the time*". (Italics supplied)

Later he said he saw the stern light of the Brown approximately 700 feet off his starboard side.

In face of the foregoing, no reason is seen for charging fault to the Brown even though her running and side lights were not shown contemporaneously with her reduction in engine revolutions, or with the placing of her helm for a starboard turn, since neither omission had any causal connection with the handling of the Gulfcoast, or the collision which resulted therefrom.

■ III. That the Brown altered her course to starboard "without sounding the required whistle signal".

This means that the one-whistle signal, which concededly was blown, was not timely. If it could be demonstrated or fairly contended even, that the navigation of the Gulfcoast was influenced by the lapse of time of say 2 minutes, between Downer's initiating a starboard turn and blowing the one-blast whistle signal, this contention would be of great force.

As has been stated, however, Eliasson not only observed the starboard turn but governed his navigation accordingly. His story is that the collision occurred not as

the result of that turn by the Brown, but of a second one which was abruptly to her own port and directly across the course of the Gulfcoast, and that he then ordered a hard left rudder on his own ship, which brought her over to 55 at the time of the impact.

If that theory of the occurrence were deemed tenable, I should suppose that the argument would be that the Brown was at fault for not blowing two blasts to announce such a change of helm, which leads to reflections that need not be dwelt upon.

In this connection, it is also apparent that the Brown's duty to keep in line astern of the Gulfcoast, and to do everything in her power to perform that duty, depended upon her understanding that the vessel which was falling back on her port side was indeed the ship whose station was number 72. If the latter chose not to reveal her identity as she could have done by permitted whistle signals, she can scarcely be heard to charge the Brown with fault for doing only that which Eliasson says he observed her in the act of doing.

■ IV. The Brown failed to stop, or to stop and reverse her engines.

It is uncontested that the Brown continued her starboard swing without reduction in speed; Downer says he considered this to be the best way out of the dangerous situation in which his ship found herself under the existing conditions.

The same thing is true of the Gulfcoast, that is, there was no change in engine speed up to the collision. Both navigators may have been in error, and the fault of one, if it was a fault, is no excuse for the other.

There are two citations to the record to support the suggestion that neither MacCallum nor Ashington denied that it would have been better to have stopped and reversed engines "before putting the wheel hard astarboard"; I have been unable to verify them.

I do not consider that the evidence discloses anything to support more than the proverbial argument that what should be exacted of the Brown is sagacity in retrospect. It cannot be said with any degree of certainty that MacCallum and Downer failed to exercise the required skill of their calling in trying to avoid contact with the Gulfcoast when they sensed the moment of peril, by turning away from her to starboard as quickly and fully as possible.

If I am wrong in thinking that no error in judgment can be predicated of the Brown's failure to stop and reverse, it is still true that such an error in extremis will be excused in the presence of flagrant and effective fault on the part of the other vessel. Helpful discussions are found in two cases cited for the Brown: The Gulf-star, 3 Cir., 136 F.2d 461, and City of New York v. American Export Lines, Inc., 2 Cir., 131 F.2d 902.

This charge falls with the prior ones.

■ V. The Brown was at fault for failing to maneuver her rudder so as to avoid the second collision.

The Gulfcoast put her helm to starboard to swing her stern away from the Brown, after the first collision, but Eliasson does not say whether it took effect within the less than 30 seconds that elapsed before the second. He says the Brown swung so much faster (obviously to her own right) that her stern collided with the starboard side of the poop deck of the Gulfcoast. How a vessel said to have been moving at top speed in a port swing could so rapidly move into a starboard turn as to cause the second collision, has not been expounded.

It is true that no midship or port helm was ordered on the Brown to mitigate a second striking, if one was to be anticipated, but in the absence of any testimony factual or expert, that such a change would have been effective, it will be seen that this contention is argumentative only, and as such is not persuasive. It is not shown that the identity of the Gulfcoast, and therefore her length, was known on the Brown even at this time, and so much would have been required as a basis for the exercise of judgment concerning the necessity for doing anything to keep clear of a vessel which had struck well forward at about a 30° angle. MacCallum says that there was so little time between the con-

tacts "that unless the man had the wheel changed before the first contact took place there was no chance of changing it".

This seems to be a convincing statement.

■ Upon the case as a whole, the conclusion is inevitable that the Gulfcoast must be held solely responsible for these collisions and the resultant damage.

Findings are filed herewith.

Settle interlocutory decree in the usual form, on notice.

In connection with the opinion of even date in this cause, the Court makes the following:

## Findings.

1. Ownership and operation of the Motor Vessel John A. Brown and the Steam Tanker Gulfcoast at the time involved in these causes is found as alleged in the pleadings.

2. The said vessels were members of a convoy which left New York on or about August 14, 1943, and arrived in the Clyde about August 28, 1943.

3. The said convoy was made up in twelve columns separated by not less than 2,100 feet, and the distance fore and aft between the vessels in each column was not less than 1,500 feet.

4. The John A. Brown is 508 feet by 70 feet, of 10,455 gross, 6,059 net tonnage. She is a single screw operated by Fiat engine, and at the time in question was fully laden with war materiel.

The Gulfcoast is an oil tanker, 426.4 feet by 64.2 feet, also a single screw vessel, having steam engines, and her gross tonnage is 7,140, her net 4,373. She was carrying oil to the capacity of her tanks.

5. On August 25, 1943, the commodore ship of the convoy was leading the seventh column in station 71; the Gulfcoast was number 72; the Socony Vacuum was number 73, and the Brown was number 74. Between noon of that day and 8:00 P. M. the Socony Vacuum withdrew from the convoy, thus vacating station 73, and the Brown seasonably moved forward to occupy station 73.

6. All incidents herein stated are according to convoy time.

Both vessels involved in these causes were adhering to their stations and moving at the convoy speed of 9½ knots. At about 9:00 P. M. visibility was cut down to about a quarter of a mile, due to a drizzling rain which then set in; the sea was moderate, and the wind was blowing out of the northwest, of a force of between 3 and 4.

7. Downer, the third officer of the Brown, came on watch at 8:00 P. M. and so remained until midnight, and there were two lookouts, one on the monkey island atop the bridge, and one on the starboard side of the bridge, and a third man, who would have been at the wheel, was also stationed as an extra lookout on the bridge.

8. On board the Gulfcoast, the third officer Watler, who had the 8:00 to 12:00 P. M. watch, was on the bridge, and had an ordinary seaman serving as lookout on the starboard side.

9. Neither vessel carried a lookout stationed at the bow from 9:00 until 10:23 P. M.

10. Between 9:00 and 10:00 P. M., the Gulfcoast failed to keep in line behind the commodore ship, number 71, but tended to veer toward column 6 on her port hand, and got sufficiently out of line so that it became necessary for her to turn to her own starboard so as to resume her station in column 7, and in executing that maneuver she reduced her engine speed between about 9:30 and 10:00 P. M. from about 61 revolutions to about 47 or 46, which caused a reduction in her speed of about 2 knots, with the result that she dropped back on the port side of the Brown, which was approximately holding position in column 7.

11. The convoy course was 82.

12. In order to follow the convoy course of 82, the Gulfcoast was required to steer a course 84 to compensate for a 2° variation in her compass.

13. Between 9:30 and 10:00 P. M. the Brown observed the presence of a vessel which bore about 2 to 2½ points on her port bow, the identity of which was unknown to any one on board the Brown, and that vessel later proved to be the Gulfcoast, which by then under her reduced speed, was falling back to a posi-

tion abeam of the Brown, and when that occurred (namely, at about 10:00 to 10:05 P. M.) the Brown flashed, by the use of an electric torch, in Morse Code, the inquiry, "What no.?", the purpose being to learn the convoy number, if any, of the vessel so observed.

14. No answer was given to the inquiry, but there was a flash from the Gulfcoast which indicated that the Brown's signal had been observed.

15. The Brown did not learn at any time prior to 10:23 P. M. that the said vessel on her port side was the Gulfcoast.

16. The Brown kept the said vessel under observation as much as possible, and observing that she was converging toward the Brown's course, the latter reduced her own revolutions from 80 to 70 in two steps, just prior to 10:00 o'clock.

17. The Gulfcoast continued to angle to her own starboard, and when Downer observed this, he realized that there was danger of collision, and turned on the Brown's running lights, which at once showed and were observed on the Gulfcoast.

18. Up to that time and for the previous two hours or more, the Brown had been navigating under her gyro pilot, and as soon as her running lights were displayed her gyro pilot was put in a hand position, and her rudder ordered put hard right, and Downer at once called the master (MacCallum) to the bridge, and the latter responded in not to exceed two minutes, and at once assumed command of the ship.

19. MacCallum promptly ordered a one-whistle blast to indicate the starboard turn as required by the International Rules, Rule 28; this was blown and was heard on board the Gulfcoast. The turn thus initiated took effect in due time and the Brown continued to swing in a wide turn during the course of which she was struck by the Gulfcoast just aft of her bow on her port side.

20. The display of running lights on the part of the Brown and her one-whistle signal were observed on the Gulfcoast, notwithstanding which the latter continued on her course, blew no whistle, showed no light, and made no effective change of helm, until it was too late to avoid the collision;

just prior to the striking, however, she accomplished a turn to port of about 30° and she struck the Brown as stated in Finding 20, and there was a second collision although the Gulfcoast sought to avoid that by a turn to starboard which was not effective, and the two vessels came together a second time and struck at or about their respective quarters.

21. Damage was occasioned to both vessels by the two collisions.

22. The Gulfcoast turned on her stern light at about 10:00 to 10:05 P. M. but by that time she had so fallen back that it was not visible aboard the Brown at any time prior to the said collision.

23. The heading of the Brown at the time of collision was about 90 or a 7° change to starboard as a result of the said starboard helm movement.

24. At the time of the collision the forward speed of the Gulfcoast was about 7½ knots and the forward speed of the Brown was about 8 knots but she lost headway by reason of her said starboard turn.

25. If it was a fault not to have lookouts on the bow, it was common to both vessels, and the Brown has demonstrated beyond a reasonable doubt that her failure to have a lookout so posted had no causal relation to the maneuvers of the Gulfcoast or to either collision.

26. The failure of the Brown to switch on her running lights when she began to slacken speed was not a fault, and if it was, it did not influence or affect the navigation of the Gulfcoast and had no causal relation to the latter, or to either collision.

27. If the failure of the Brown to sound her one-blast signal, indicating a turn to starboard, until the master took command and ordered that signal to be given—an interval of not to exceed 3 minutes—was a fault, it did not influence or affect the navigation of the Gulfcoast whose master was aware of and testified concerning the gradual turning of the Brown to starboard from the time when he observed her running lights until the first collision took place, and the said delay had no causal relation to either collision.

28. The failure of the Brown to stop and reverse her engines, at the time that

danger of collision was known to be imminent, was the result of a decision made in extremis, that the danger of collision could best be avoided by putting a hard starboard helm into effect as promptly and completely as possible.

29. The failure of the Brown to move her rudder from her starboard to midships and then to port between the first and second collisions was not a fault, because no effective change of helm could have been made in the short interval of time that elapsed between the two strikings.

30. The Gulfcoast was at fault in the following respects:

(a) She did not reply to the inquiry flashed from the Brown in the effort to ascertain the identity of the Gulfcoast.

(b) She did not display her running lights after observing the Brown's running lights or at any time up to and including the collisions.

(c) She did not sound any whistle signal up to and including the time of the first collision.

(d) She did not alter her helm to port to avoid striking the Brown, although she had the Brown under close observation for 20 minutes, until it was too late to avoid collision, by which time the Gulfcoast had changed her course from about 82 to 55.

31. If the Gulfcoast had disclosed her identity either by answering the inquiry made by signal flash, or by blowing her whistle so as to announce her station number, she would have imposed upon the Brown the duty of cooperating with the Gulfcoast in her effort to safely resume her station in the seventh column, by adopting any teaching of prudent navigation calculated to accomplish that purpose.

32. The faults of the Gulfcoast, taken together, caused both the first and the second collision, while the Brown neither did nor omitted anything which caused said collisions or contributed thereto.

### Conclusion.

The Gulfcoast was solely responsible for the collision referred to in Finding 20 above, and must be held liable therefor in an amount to be proved before a Special Master to be appointed for the purpose.