## ORIENTAL TRADING & TRANSPORT CO., Limited, v. GULF OIL CORPORATION.

No. 129, Docket 21173.

United States Court of Appeals
Second Circuit.

Feb. 28, 1949.

Writ of Certiorari Denied May 31, 1949.

See 69 S.Ct. 1162.

Burlingham, Veeder Clark & Hupper, Chauncey I. Clark, and Stanley R. Wright, all of New York City, for claimant.

Macklin, Brown, Lenahan & Speer and Paul Speer, all of New York City, for libellant.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

The Gulf Oil Corporation appeals from a decree in the admiralty, holding solely liable its ship, the "Gulfcoast," for a col-

lision on the night of August 25, 1943, on the high seas, with the libellant's ship, the "John A. Brown," while both vessels were in convoy. Judge Byers has written an exceptionally careful and detailed opinion [1] which states the facts and the legal positions of the parties so completely that we shall use it as the basis of our discussion. Upon the appeal the Gulf Oil Company does not seek to excuse the "Gulfcoast," but confines its argument to the supposed faults of the "Brown." We shall consider these in the order of their presentation, so far as it seems to us that they have enough substance to need answer.

■ We agree that it was a fault for the "Brown" not to give a single blast at the time she put her rudder hard right. Moreover, it was a statutory fault, although the 28th Article of the International Rules [2] does not expressly declare that the signal shall be immediate. The purpose of the rule—like that of all rules touching signals —is to advise the ship to which the signal is addressed that she can no longer rely upon the signalling ship's being at those future positions to which her observed course would otherwise bring her, but that she will be at those which the signal forecasts. Pending any delay in giving the signal the addressed ship is being positively misled, for she will properly assume that the ship, which at length does signal, has meanwhile continued on her course.[3] In the case at bar, therefore, in order to escape half damages the "Brown" must prove beyond reasonable doubt that the collision would have occurred, even though she had blown at the moment when she changed her helm.[4] The testimony of the "Gulfcoast" was wide of the facts, but she cannot justly complain, if we accept it as honest, as we shall do. That is, we shall assume that it truthfully states how the "Brown" appeared to be moving to those aboard the "Gulfcoast." The upshot of this testimony was as follows.

■ Eliasson, the master, did not come on deck until after the "Brown" had turned on her lights, which he saw. She then appeared to be approaching on his starboard quarter, showing her red light. Her course was parallel to the "Gulfcoast's," or perhaps "edging away at a small angle"; she pulled away and passed, until she showed only her blue stern light. When she got about four points on the "Gulfcoast's" starboard bow, she made a sudden "sheer" to the left, opened her red light, and struck the "Gulfcoast," which, in a vain effort to escape, had herself swung about 30° to the left. At no time did he hear any whistle from the "Brown." Watler, the third mate, who had been on watch, brought Eliasson to the bridge because the "Brown" was not in her "station," and was coming up on the "Gulfcoast's" starboard quarter. At no time did the "Brown" show any running lights, or a light of any sort except her stern light after she had passed. Nor did she blow at any time. Eckman, one of the armed guard, could not remember whether the "Brown" blew at all; he did not see any running lights. Graves, another of the armed guard, saw only the "Brown's" stern light, until she began to swing to the left; but he did hear a short blast from her "maybe not over five seconds before the collision." Keller, the lookout, saw the lights when the "Brown" turned them on; and heard a short blast "just before the collision." "It acted almost as one whistle came and then the collision came."

From the foregoing it appears that those on the "Gulfcoast's" bridge did not hear the signal at all. Indeed, if it had been sounded at the moment when the lights were turned on, Eliasson would presumably not have heard it, for he was then in his stateroom; or, if he had heard it, it would have had no significance. Watler even failed to see the "Brown's" lights, and his failure also to hear the signal, when it was in fact given, makes it extremely doubtful that he would have done better, had it been sounded earlier. However, even if we suppose that he would have done so, it is most improbable that he would have changed his navigation. It is true that he thought the

[1] 75 F.Supp. 935.
[2] Title 33 U.S.C.A. § 113.
[3] The Cushing, D.C., 266 F. 570, 573, affirmed 2 Cir., 292 F. 560; The Corozal, D.C., 62 F.Supp. 123.
[4] The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148.

"Brown" uncomfortably near; yet in spite of that concern, he did nothing, thinking that the time had not come for action on his part, not even by turning on his lights. This being his estimate of the situation, an earlier blast from the "Brown," if he had heard it, would have advised him that she was swinging away from him, and that would, or should, have given him added confidence that the ships would not touch. Indeed, they would not have done so, as he saw the event, save for one of those unaccountable and wanton "sheers," which come so frequently to the relief of mariners charged with faulty navigation of their own. It is true, that a signal would have told him that the "Brown" did not share his sense of security; but it would also have indicated to him that out of excessive timidity, she was making assurance doubly sure. It is indeed impossible to demonstrate beyond peradventure that such a signal could have had no effect upon the "Gulfcoast's" movements; but we conceive that the burden is not so heavy as that. It does appear to us that the chance that she would have acted differently is too remote to count; and we hold that the "Brown" has shown that her fault did not contribute to the collision.

■ Although it has been held—and we agree—that it is a fault not to turn on the lights of a ship in convoy when the time to take action has come,[5] the fault is not a statutory one, and does not throw upon the delinquent ship the burden of proving that compliance with her duty would have prevented collision. It is a fault which the ship that asserts it, must show to have been at least one cause of the collision. In The Cushing, supra, we cited The Pennsylvania, supra, as though the opposite were true, but that was inadvertent. Perhaps in the case at bar, the point does not indeed arise, for it is very doubtful whether the time for action had arrived before the lights were in fact turned on. The ships had already been in communication, and the "Brown" was justified in supposing that the "Gulfcoast" had made her out and would keep out of her way; for the "Brown" was in her column, and the "Gulf-

coast" was not. Besides, it must be remembered that to light up even a single ship may expose a whole convoy to attack, for lights can be seen far off; and a master's decision must always be a choice between that danger and the danger of any further delay in disclosing the position of his own ship.

■ Be that as it may, we agree with Judge Byers that, even though the "Brown" ought to have turned on her lights earlier, the "Gulfcoast" has not shown that this would have avoided collision. The interval between the time they were turned on and the collision is left in the doubt common in such situations. Downer had turned them on before he went to rouse MacCallum, the "Brown's" master, and at least a couple of minutes must have elapsed between the time Downer left and MacCallum appeared. MacCallum estimated that the collision was two or three minutes after he did appear. Eliasson, who, as we have said, saw the lights when he came to the "Gulfcoast's" bridge, thought he had been there twenty minutes before the collision. Whatever the interval, it was therefore certainly ample to advise the "Gulfcoast" of the "Brown's" position and movements, so far as lights would do so, and to give her every chance to act. She did nothing, because she thought that nothing was enough. By what reasoning she can now ask us to hold that, had she seen the lights earlier she would have acted differently, we do not understand.

■■ We should be unwilling to qualify or abate in any way the duty of a ship to stop and back in the presence of a danger which that action would be likely to avoid. The admonition in the New York,[6] we have ourselves often repeated. When ships are head and head, it is especially preemptory; and so it may be when they are to cross. But in crossing cases it is not always and inevitably the best way to escape, for it may result in putting a ship in the path which the other ship has selected. In the case at bar, when Downer put his rudder hard right, the time for action had come; he was correct in understanding that the "Gulfcoast" was crossing

---

[5] The Cushing, 2 Cir., 292 F. 560.

[6] 175 U.S. 187, 207, 20 S.Ct. 67, 44 L.Ed. 126.

although he could not tell whether she would pass ahead of him or astern. If she were to pass ahead, his best action was indeed to stop his way; but if astern, it was the worst. On the other hand, to make off at full speed to the right would at least reduce the resultant of the speeds at which they would collide, if they did; and, so far as he could tell in the darkness, it did not increase the chances that they would come together at all. Such an emergency is totally different from one in which the ships can see each other and approximate their true respective courses. This fault we hold not to have been proved.

Although a lookout is one of the most essential safeguards on a ship, nothing could less insure his value than rigidly to circumscribe his functions. Normally, he should indeed be stationed in the bow;[7] because there his view is not obstructed; and apparently he can see better when close to the water than aloft. However, all such considerations yield, when the weather makes another position more suitable. It would be fatuous to the last degree to insist upon his being on the forecastle, where rain or sleet or even high winds in his face interfere with his vision. Both ships were sheltering their lookouts—a good indication that that was a reasonable precaution.

In conclusion we are not disposed in general to consider too curiously the navigation of the "Brown" in the face of the extreme negligence of the "Gulfcoast." The well settled doctrine that, when one ship is gravely at fault, the conduct of the other will be somewhat glozed over, is not altogether rational; perhaps, it is no more than an unconscious compensation for the resistance of the bar and the underwriters to the apportionment of liability. To divide damages in halves is certainly better than the doctrine of the common-law which denied all recovery if the plaintiff was at fault at all; but the course of the law has steadily been to proportion the recovery by the mutual degrees of fault, and the irrationality of the present situation in the admiralty is glaringly illustrated when we consider that, if personal injuries are involved, proportional fault is recognized.[8] However, we have no power to divest ourselves of this vestigial relic; we can only go so far as to close our eyes to doubtful delinquencies. Happily, in the case at bar, we need not do even that.

Decree affirmed.

---

[7] The Buenos Aires, 2 Cir., 5 F.2d 425.

[8] The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586.