371 F.2d 944
 The HUTTON COMPANY, as owner of the SCOW R. ENGELBRECHT,
Libellant-Appellee,
v.
ARROW BUILDERS SUPPLY CORPORATION, Respondent-Appellant, TUG
CHIPPEWA II, Nassau Towing Corporation,
Claimant-Respondent-Appellee, TUG
VALMORAC, Valmorac Tugboat
Corp.,
Claimant-
Respondent-Appellee.
 No. 185, Docket 30731.
 United States Court of Appeals Second Circuit.
 Argued Nov. 17, 1966.
Decided Jan. 30, 1967.
 
 John C. Hart, Macklin, Hanan & McKernan, New York City, for libellant-appellee.
 Hyman R. Friedman, Maley M. Cohen, E. Edan Spencer, New York City, for respondent-appellant.
 John R. Hanrahan, Jr., Foley & Martin, New York City, for Tug Chippewa II and Nassau Towing Corp.
 Before WATERMAN, MOORE and HAYS, Circuit Judges.
 
 
 1
 WATERMAN, Circut Judge.
 
 
 2
 This is an appeal in the admiralty from an interlocutory decree of the United States District Court for the Southern District of New York. Following a collision between a barge and a scow on the Harlem River the libellant, Hutton Company (Hutton), owner of the scow, sued Arrow Builders Supply Corporation (Arrow) and the tugs Chippewa II and Valmorac and their owners. Arrow cross-claimed against the tugs, and, in the event the tugs were found at fault the owner of the Tug Valmorac cross-claimed against the Chippewa II. Arrow was held liable to Hutton. The tugs and their owners were absolved of any fault, Hutton's libel against them was dismissed, as was also Arrow's cross claims against them. Arrow appeals the determination that it was wholly at fault for the collision and the determination that neither Hutton nor either of the tugs were in any degree liable therefor.[1]
 
 
 3
 The accident occurred in the Harlem River in front of Arrow's dock just south of the 207th Street Bridge. The river runs approximately north and south at this point and is several hundred feet wide. The bridge which rotates to permit tall vessels to navigate through it is supported by a long center abutment which extends lengthwise in the river beyond the bridge proper, thereby dividing the river into two channels or 'draws.' The abutment extends in front of Arrow's dock which is on the east bank of the river, and therefore is located upon the easterly channel through, or the easterly 'draw' of, the bridge. The abutment is approximately 150 feet from Arrow's dock, which is the width of the easterly draw, which width would of course be narrowed by the beam of any vessel moored at Arrow's dock.
 
 
 4
 On the morning of January 22, 1962, two Hutton Company scows were moored at Arrow's dock, the William Hutton, the nearer to the bridge, and the R. Engelbrecht, southerly of the William Hutton. The scow Englebrecht, 117 feet long, had arrived at the Arrow dock in early December with a full load of brick consigned to Arrow. As of January 22 only a portion of this cargo had been discharged. On the morning of January 22 Arrow's employees planned to unload some of the brick which was on board the Englebrecht. In order to remove this brick more easily they decided to shift the Englebrecht from its position next to the dock and moor it outboard of the William Hutton where it would be more accessible to the crane used to unload the brick. The plan was to utilize the flow of the tidal current to move the Engelbrecht which had no motive power of its own. The crane was to shove the bow of the scow away from the dock while the tidal current was flowing northward and the scow would then move into position with little effort on the part of those making the move. The bargee of the Engelbrecht, an employee of Hutton, was informed of this plan and did not oppose it, he too being of the belief that the tidal current was running northerly and the proposed operation could be successfully performed.
 
 
 5
 At approximately 10:15 A.M. the lines to the bow of the Englebrecht were cast off and its bow was pushed out into the stream by the crane. Her two stern lines remained moored to the dock so the scow was not entirely adrift. Unfortunately, the Arrow employee carrying out the plan had made a serious miscalculation because the tidal current at that time was not running northerly, as was necessary to carry out the planned maneuver, but southerly. The current, instead of causing the Engelbrecht to drift northward alongside the William Hutton, caused its bow to drift southeward out into the stream and the scow came to be placed broadside in the river across the easterly draw of the bridge, blocking a wide portion of its with its 117 foot length.
 
 
 6
 At the same time that Arrow's employees were shifting the Engelbrecht, the oil barge Dana Bray was being pushed up the Harlem River against the tidal current by the tug Chippewa II which was tied to the barge's starboard side and the tug Valmorac which was pushing the barge from astern. The tug Chippewa II was directing the movements of the flotilla which proceeded northward at a full speed of about 7 knots until it reached a point opposite 201st Street. There it reduced speed to 3 1/2 knots in order to proceed past Arrow's dock and through the easterly draw of the 207th Street bridge.
 
 
 7
 It was necessary for the tugs to take the Dana Bray through the easterly draw because another flotilla, northerly of the bridge, was moving south to pass through it. An exchange of whistle signals between the tug Chippewa II, in charge of the flotilla proceeding northward, and the tug Gene Pope, in charge of the flotilla proceeding southward, had established that the two flotillas would pass port to port, the southbound one using the westerly draw and the northbound one the easterly draw.
 
 
 8
 As the Chippewa II, Dana Bray and Valmorac approached Arrow's dock the captains of the tugboats observed that the one scow (Englebrecht) was not moored parallel to the dock but was at an angle to the dock with one end protruding into the draw. The captain of the Chippewa II, in charge of the flotilla, noted that while the scow's position narrowed the available space, there was still room for his flotilla to pass by it if the Engelbrecht did not move farther out into the stream. He therefore maintained the flotilla's speed until, too late, he determined that the end of the scow was moving farther out and was blocking the path of the flotilla. The tugs then reversed their engines, but they were unable to stop the Dana Bray's forward motion before it collided with the Engelbrecht. The starboard bow of the Dana Bray, when its port bow was but a narrow four feet or so from the bridge abutment, struck the port side of the Engelbrecht, stove a hole in her, and sunk her.
 
 
 9
 The physical facts as outlined here are as they were found to be by the district court, and, as so found, are not clearly erroneous. Appellant, not disputing the facts, claims that even though they be undisputed the decree below was erroneous.
 
 
 10
 First, with reference to the facts found as to the acts of the tug Chippewa II, appellant Arrow claims that the court below erred in not applying to these acts the statutory standard of care found in the Navigation Rules For Harbors, Rivers, and Inland Waters, 33 U.S.C. 151-231, and specifically in not applying the rule that governs the situation where one vessel overtakes another, 33 U.S.C. 209.[2] This rule is not applicable here. It was intended to govern the situation in which two vessels are underway in the same direction, one behind the other, with the one behind proceeding at a greater rate of speed than the one in front. Here the vessel supposedly being overtaken was a 'dumb scow' which was drifting helplessly with the current and was partially secured to a pier. The overtaking rule only applies to vessels on steady courses, not those maneuvering at a dock or those in other unusual circumstances. The John Rugge, 234 F. 861 (2 Cir. 1916).
 
 
 11
 Aside from urging the application of this statutory standard, Arrow cites a number of cases for the proposition that there is a presumption of fault where a moving vessel, such as the Dana Bray, collides with one at rest. While there may be such a presumption, the existence of such a presumption provides no basis here for overturning the trial court's findings as to negligence. Even if it is presupposed that the issue of one's negligence is not a simple factual issue to which the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a) can be mechanically applied, we have no reason to believe that here when he made his findings the trial judge failed to apply the correct legal standard, including the giving of consideration to the aforementioned presumption.
 
 
 12
 The trial court, and we, on this record can quite fairly conclude that the tug captain of the Chippewa II could have reasonably believed that the personnel handling the scow had it under sufficient control so that it would not swing farther out into the stream and block the passage of his flotilla.
 
 
 13
 When the Arrow personnel were so clearly at fault in losing control of the scow, it was not necessary to search exhaustively to uncover some possible contributory fault on the part of the tugs. Oriental Trading & Transp. Co. v. Gulf Oil Corp., 173 F.2d 108, 111 (2 Cir.), cert. denied, 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728 (1949); Globe Oil Delivery Corp. v. City of New York, 129 F.2d 636, 638 (2 Cir. 1942).
 
 
 14
 Second, with reference to the trial court's finding that the 'bargee' of the R. Engelbrecht, an employee of libellant Hutton, was aware of the plan to move the barge and acquiesced in it because he shared the mistaken impression of Arrow's employees that the current was flowing north, Arrow claims that this was a finding that the bargee was negligent and that the bargee's negligence must be attributed to the barge owner Hutton, his employer.
 
 
 15
 There are a considerable number of cases dealing with the barge owner's responsibility for the conduct of his bargee. The leading case of Dailey v. Carroll, 248 F. 466 (2 Cir. 1917) establishes that these employees who owe their employers the duty to care for their vessels are no more than laborers or deckhands and are not to be looked upon as shipmasters. Generally, the courts have held that a bargee is responsible to his employer for actions in which he participated if the result was attributable to the exercise of his judgment in a matter which he is to be deemed capable of judging. See, for example, The Teno, 47 F.2d 197 (2 Cir. 1931); Hastorf Contracting Co. v. Ocean Transp. Corp., 4 F.2d 583 (SDNY 1923), aff'd, 4 F.2d 584 (2 Cir. 1924). But here it is Arrow's claim that the inactivity of the quiescent bargee while Arrow's employees negligently damaged the barge makes the barge-owner liable for the damages to his own barge. As the district court points out, the bargee merely interposed no objection to the action taken by Arrow's employees and took no active part in the operation that Arrow was performing for Arrow's sole convenience.
 
 
 16
 Here there is nothing in the record to show that Arrow's employees relied in any way on the bargee's judgment or his beliefs about which direction the tide was running. The participants were all employees of Arrow who wished to unload cargo belonging to Arrow and relied upon their own judgment and beliefs as to how best to accomplish the end desired. We agree with the district judge that on these facts, the collision being proximately caused by the activities of Arrow alone, no negligence is imputable to the barge-owner.
 
 
 17
 Affirmed.
 
 
 
 [1]
 The disposition below of an entirely unrelated second count for the price of bricks sold and delivered by Hutton to Arrow was not appealed
 
 
 [2]
 33 U.S.C. 209 reads in part:
 Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.