**UNITED STATES of America,**

v.

**William C. ADAMS, Appellant.**

**No. 16036.**

United States Court of Appeals
Third Circuit.

Argued Jan. 19, 1967.

Decided April 13, 1967.

Raymond G. Hasley, Pittsburgh, Pa. (Harold R. Schmidt, Rose, Schmidt & Dixon, Pittsburgh, Pa., on the brief), for appellant.

W. Wendell Stanton, Asst. U. S. Atty., Pittsburgh, Pa. (Gustave Diamond, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE, GANEY and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant was convicted by a jury of operating a vessel in a reckless or negligent manner in violation of 46 U.S.C. § 526l.[1] A fine of $500.00 plus costs was assessed pursuant to 46 U.S.C. § 526m. Defendant appeals from the denial of his motions for judgment of acquittal and for a new trial.

The pertinent facts are not in dispute. Having previously procured a pilot's license in 1946, defendant Adams in the early 1950s obtained a Master's license and thereby became the fourth generation in his family to follow the tugboat navigation profession. On October 1, 1963 Adams was in charge of the towboat "Humphrey", a vessel 132 feet long owned by the Consolidation Coal Company which had employed Adams for nearly sixteen years. At 5:45 a. m. Adams came on watch to pilot the "Humphrey" up the Ohio River toward Pittsburgh as it pushed eleven empty coal barges extending 525 feet ahead in a four-three-four pattern. In the pilot house thirty feet above the water the captain, the lookout, and a third crew member had an unobstructed view out over the empty barges. Because fog had considerably reduced visibility, however, Adams sounded his fog horn every minute and operated by radar and radio communication. He safely overtook another vessel, sent a radio message that he was upbound, and approached Phyllis Island through a partial clearing in the fog.

Once past the island Adams observed the fog closing in again in the vicinity of the Shippingport Bridge which he knew was located 1,000 feet downstream from a ferry crossing. In case any traffic should be coming downriver he favored the Shippingport bank to his right. Adams reduced speed almost to an idling position and the barges and tug just coasted under the bridge. All the while Adams sounded his vessel's fog horn which had a range of one mile. Mindful of a navigational rule that a vessel at shore must remain there until a moving vessel such as his has passed, Adams watched his radar screen and listened for fog horns and radio communications. A deck hand was on the front of the "Humphrey", but in response to questions from the trial court Adams stated that no lookout had been placed on the forwardmost barge because of the danger in fog of having a man out on wet, slippery barges obscured from the pilot house over 525 feet behind.

As he heard nothing and saw on the radar screen only the image of an aerial wire crossing located seventy and more feet upstream from the ferry crossing, Adams slowly began increasing his speed again. Just at this moment he heard someone call for help from out in the thick fog which had reduced visibility practically to zero. It soon became apparent that there had been a collision with the ferry as a result of which two ferry passengers drowned.

The ferry boat consisted of a flat barge propelled by a tug alongside. It followed an irregular schedule of crossings according to need, although Adams knew that in the morning hours it often carried steelworkers to and from work. With the sounding of its horn the ferry on the morning in question departed from the Shippingport side of the river at about 7:40. The ferry's horn was sounded a second time about a minute after the boat had set out into the river. The toll collector on the ferry thought he heard an approaching vessel, but did not notify the ferry's captain. A car

---

1. 46 U.S.C. § 526l, subsection (a), provides as follows:

   "No person shall operate any motorboat or any vessel in a reckless or negligent manner so as to endanger the life, limb, or property of any person. To 'operate' means to navigate or otherwise use a motorboat or a vessel."

Defendant argues that this criminal statute should be interpreted to require a showing of gross misconduct. However, we shall assume without deciding that evaluation of the evidence should be governed by the civil standard of ordinary negligence which was adopted by the trial court in its jury instructions.

passenger on the ferry stated that he definitely heard a horn out in the fog, but that the ferry's speed did not change. The ferry's horn was sounded a third time a few seconds before the accident.

Captain Adams and the two crew members who were with him in the pilot house on the "Humphrey" never heard the ferry's horns which had a range downriver of only 630 to 800 feet.[2] Nor did they hear any radio signals from the ferry, even though the ferry captain made two radio calls.[3] Finally, they did not pick up the ferry on the radar screen, even though the set had a range of one mile. Adams explained that his radar would not have distinguished an object underneath the aerial wires where the ferry apparently was located at the time of the collision, and that if the ferry had followed its designated crossing the wires would not have interfered with his radar capability of spotting the ferry.

In the information Adams was charged with 1) traveling at an immoderate rate of speed in conditions of poor visibility; 2). failure to interpret radar signals properly; and 3) failure to keep a proper lookout in the forward position of the tow.

█ We first consider whether defendant's motion for judgment of acquittal should have been granted.

Our review of the evidence leads us to conclude that there was insufficient proof of immoderate speed or misinterpretation of radar signals to justify a jury finding of negligence or recklessness beyond a reasonable doubt. As soon as Captain Adams observed the thickening fog around the bridge he idled his engines and allowed his vessel to drift forward. Not until the forwardmost barge was about to pass under the wires which he knew to be upstream from the designated ferry crossing did Adams begin to engage his boat's en-

gines again just as the collision took place. And his testimony was uncontradicted that radar signals could not have distinguished between objects as close together as the ferry and the wires appeared to be at the time of the accident.

The question then becomes whether defendant's failure to post a lookout on the bow of one of the leading barges constituted evidence upon which a jury could base a finding of negligence or recklessness beyond a reasonable doubt.

█ Although rules established in libels are not necessarily applicable in criminal prosecutions, we can accept the proposition that generaly a lookout must be placed on the bow of a vessel:

"Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose, on the forward part of the vessel. . . ." The Ottawa, 3 Wall. 268, 70 U.S. 268, 273, 18 L.Ed. 165 (1865).

While it might be asserted that this is a hard and fast rule, "we do not agree that *under all circumstances* lookouts must be stationed well forward." The Mamei, 152 F.2d 924, 929 (3rd Cir. 1945). As Judge Learned Hand noted in Oriental Trading & Transport Co. v. Gulf Oil Corp., 173 F.2d 108, 111 (2nd Cir. 1949):

"Although a lookout is one of the most essential safeguards on a ship, nothing could less insure his value than rigidly to circumscribe his functions. Normally, he should indeed be stationed in the bow; because there his view is not obstructed; and apparently he can see better when close to the water than aloft. However, all such considerations yield, when the weather makes another position more suitable."

---

2. The deckhand on the bow of the "Humphrey" also heard no fog horns from the ferry.

3. Two other witnesses who had radio receivers turned on at the time also heard

no radio signals from the ferry. A third witness who had installed the ferry's radio and who had later examined it stated that at the time of the accident the ferry's radio was not in working condition as the result of a defective tube.

In the foggy conditions which he encountered the captain here decided not to place a lookout on the forwardmost barge obscured from the pilot house located 525 feet behind. Obviously, because of the fog some kind of communication device would have been essential in order for such a lookout to have served any purpose at all. Even then, by the time such a lookout could observe an object in the water and communicate with the pilot house it is unlikely that action could be taken to avoid a collision. While not decisive as it would be in a civil action where a causal connection between the conduct and the accident must be shown, this consideration is an important indication of the reasonableness of the captain's judgment. In addition, the captain reasonably believed that placing a crewman in a position at the front of the barges would have been dangerous.

■ We note also the reasonable assumption of Captain Adams that the ferry operator would follow proper procedures. The trial court certainly was correct in instructing the jury that to find defendant guilty it was not required to find that the ferry captain had exercised due care. However, Adams did not have to anticipate that the crew of the ferry would not hear or respond to his fog horn or observe the navigational rule that the vessel at shore should wait until he passed. Compare The Sagamore, 247 Fed. 743, 751 (1st Cir. 1917). Nor did Adams have any reason to know that the ferry's horn could not be heard over 800 feet away.

■ From our analysis of the evidence we conclude that a jury would not be legally justified in finding defendant negligent beyond a reasonable doubt on the basis of a failure to station a lookout on the forwardmost barge.

In its memorandum the trial court reasoned that "to say there is no need for a lookout on the forward tow is to conclude that no lookout was required at all under the foul weather conditions encountered by Captain Adams on the morning in question", and that if a lookout "was not required under the circumstances in this case, then it is difficult to see under what circumstances it would be required, as this vessel was proceeding at the time of the collision in almost zero fog." In support of its position the trial court quoted the following language from The Sagamore, 247 F. 743, 755 (1st Cir. 1917):

"The denser the fog and the worse the weather the greater the cause for vigilance. A ship cannot be heard to say that a lookout was of no use because the weather was so thick that another ship could not be seen until actually in collision. Marsden on Collisions at Sea (6th Ed.) 472, 474."

The trial court's analysis gives insufficient recognition to advances in technology. We think that the availability of radar and other communication devices is an important factor in evaluating the adequacy of a lookout. This is particularly so here because the weather conditions rendered it not unreasonable to station the lookout with Captain Adams and a third crew member in the pilot house where the lookout duty could be performed with the aid of modern detection equipment. Nor is the forward-lookout rule destroyed by an exception made in circumstances where positioning a lookout on the bow would be ineffective and dangerous.

■ It is necessary to discuss only one other basis for the contention that a jury would have been legally justified in finding negligence beyond a reasonable doubt. The trial court instructed the jury that "another thing he could have done very easily, is he could have attempted to call somebody on his radio." But Captain Adams earlier that morning had radioed his upward journey, and he had no way of knowing that he was not heard on the ferry because its receiver was out of order. In addition, he might reasonably have felt safe listening for incoming radio calls without transmitting messages himself. Therefore, the failure to attempt radio calls likewise was insufficient evidence upon which to base

a finding of negligence beyond a reasonable doubt.

We conclude that defendant's motion for judgment of acquittal should have been granted. In light of our disposition of this appeal there is no need to consider other points raised by defendant.

The order of conviction and fine is reversed with instructions to enter a judgment of acquittal.